T.C. Memo. 2006-173


UNITED STATES TAX COURT


WECHSLER & CO., INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9667-04.                    Filed August 17, 2006.


<u>Edward I. Foster</u>, <u>Jessica S. Powers</u>, <u>Harold N.</u>
<u>Pappas</u>, and <u>Leonard D. Steinman</u>, for petitioner.

<u>Carmen M. Baerga</u>, <u>Joseph W. Fogelson</u>, and <u>Marvis</u>
<u>A. Knospe</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, <u>Judge</u>:  By notice of deficiency dated March 11,
2004, respondent determined deficiencies in petitioner's Federal
income taxes as follows:

| Taxable (Fiscal) Year Ended May 31 | Deficiency |
|---|---|
| 1992 | $898,237 |
| 1993 | 1,182,805 |
| 1994 | 1,165,619 |
| 1995 | 1,152,613 |
| 1996 | 1,048,539 |
| 1997 | 66,710 |
| 1998 | 1,251,760 |
| 1999 | 270,594 |

The deficiencies result principally from respondent's adjustments disallowing (1) a portion of the deductions that petitioner claimed for the foregoing taxable years for amounts paid as compensation to Norman Wechsler (Mr. Wechsler), petitioner's president and controlling shareholder and an owner of a majority of its common stock; (2) a portion of the deduction that petitioner claimed for its 1999 taxable year for an amount paid as compensation to Sharon Wechsler (Mrs. Wechsler), petitioner's employee and corporate secretary and Mr. Wechsler's wife; and (3) all of the deductions that petitioner claimed for its 1992 and 1993 taxable years for compensation paid to Gilbert Wechsler (Gilbert), an alleged consultant to petitioner during those years and Mr. Wechsler's brother.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Many dollar amounts have been rounded to the nearest dollar, and the term "fiscal year" will be used to refer to both

petitioner's annual accounting period and its taxable year.
Petitioner bears the burden of proof. See Rule 142(a)(1).[1]

## FINDINGS OF FACT

Some facts have been stipulated and so found. The stipulation of facts, with attached exhibits, is incorporated herein by this reference.

<u>Background</u>

At the time the petition was filed, petitioner maintained its business office in Mt. Kisco, New York. From 1962 until November 1992, petitioner's office was in New York City. Thereafter, petitioner's office was in Mt. Kisco, New York.

Petitioner is a successor to Ogden, Wechsler, & Co., a partnership formed in 1947 by Charles Ogden and Mr. Wechsler's father (the partnership). The partnership was a broker-dealer specializing in trading as a market maker or specialist and retailing obscure and limited-float real estate securities. Those securities traded sporadically in the over-the-counter market. In January 1947, the partnership registered with the Securities & Exchange Commission (SEC) to act in the capacity of a broker-dealer. From 1947 through 1957, the partnership (1)

---

[1] Sec. 7491, which, under certain circumstances, shifts the burden of proof to the Commissioner, is inapplicable because the examination in this case began before July 22, 1998, the effective date of that section. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

expanded its trading activities to include trading a few additional over-the-counter stocks, convertible bonds, and preferred stocks, and (2) began to act as a "broker's broker" (i.e., trading with other broker-dealers on an undisclosed basis on behalf of another broker-dealer, typically the investment banker for the securities traded).

In 1962, the partnership's then partners incorporated their firm under the name of Ogden, Wechsler, and Krumholz, Inc., the corporation that is petitioner in this case. Upon the retirement of Charles Ogden in 1965, petitioner changed its name to Wechsler & Krumholz, Inc. In 1992, petitioner changed its name to Wechsler & Co., Inc.

Mr. Wechsler became an employee of petitioner's in July 1963, an officer of petitioner's in June 1967, a member of petitioner's board of directors in May 1969, and a shareholder in petitioner in June 1969. By 1965, the focus of petitioner's business was trading convertible securities and acting as a broker's broker. From 1963 through 1966, Mr. Wechsler worked for petitioner as a trader's assistant and clerk. From 1966 through 1970, he became a senior trader for petitioner. In 1970, he became petitioner's head trader, a position he held until 1978, when he became petitioner's president. In 1986, he became chairman of petitioner's board of directors. He has been both petitioner's president and chairman of its board since 1986.

During most of the 1980s, Mr. Wechsler and Elroy Krumholz (Mr. Krumholz) were involved in the management of petitioner. Mr. Krumholz was the son of a partner in the partnership (petitioner's predecessor). Mr. Krumholz joined petitioner as an employee in June 1967 and became an officer of petitioner in June 1967 and a shareholder in petitioner in 1969. As of August 1972, Mr. Wechsler's father, Mr. Krumholz's father, Mr. Wechsler, and Mr. Krumholz each owned 80 shares, or 25 percent, of petitioner's then-outstanding common stock. Mr. Krumholz's father died in September 1978, at which time petitioner redeemed all of the common and preferred stock that Mr. Krumholz's father had owned in petitioner. Mr. Wechsler's father died in June 1986 and bequeathed his 80 shares of common stock in petitioner to Mr. Wechsler, making Mr. Wechsler the owner of 160 of petitioner's then 255 outstanding shares of common stock. After Mr. Krumholz died in 1988, petitioner redeemed all of Mr. Krumholz's common and preferred stock in petitioner.

Petitioner's Business From 1991 Through 1999

By 1991, petitioner functioned primarily as a market maker, or "specialist", in convertible bonds, as a broker-dealer in convertible bonds, and as an investor for its own account in convertible bonds, with a portion of its portfolio in hedged positions. A specialist serves to "make a market", particularly for thinly traded securities, standing ready to buy or sell the

securities as demanded to provide increased liquidity, especially where there is a temporary imbalance between buy and sell orders from investors.

Convertible bonds are hybrid instruments; typically they are subordinated debentures with a fixed interest rate, a fixed maturity, and an ability to be converted into the issuer's stock at the holder's option. Bonds generally have been and remain thinly traded.

A hedge in convertible bonds typically consists of a long position in the bonds and a short position in the underlying common stock into which the bonds can be converted, which is intended to be market neutral (i.e., to have the combined bond and stock positions not generate major additional profits or losses even with large moves in the overall markets).

Before moving to Mt. Kisco in December 1992, petitioner had as many as 53 employees in its New York City office. Until December 1992, petitioner had its own "back office" operation in which petitioner's staff "cleared" securities (i.e., moved the actual certificates in sales transactions), kept records and accounts of trades, sent and received confirmations, and maintained records otherwise required by the SEC, securities exchanges, and the National Association of Securities Dealers (NASD).

Upon moving to Mt. Kisco, petitioner eliminated most of its back office operation and outsourced most of those functions to Bear Stearns & Co. Shortly after its move to Mt. Kisco in December 1992, petitioner had approximately 20 employees. By 1999, the number of petitioner's employees decreased to 12.

Petitioner produced profits for itself in various ways: (1) As a market maker, petitioner profited from the spread between bid and ask prices; (2) as a principal rather than an agent, petitioner earned income from executing trades on behalf of its institutional clients and, to a smaller extent, from executing trades on behalf of other broker-dealers;[2] (3) petitioner profited from short-term opportunities created by imbalances in convertible bond prices and underlying stock prices; (4) petitioner earned trading profits from long-term investments that were entered into after significant analysis and research; (5) petitioner profited from its hedge portfolio; (6) petitioner profited on new issues of convertibles, for which it acted as a primary market maker and influenced the pricing and distribution of those securities, profiting from redistribution of those securities from short-term buyers to long-term buyers; and (7)

---

[2] Acting as principal rather than an agent, petitioner was the counterparty for the sale or purchase by its client (or another broker-dealer). The transaction was in effect free of market risk to petitioner if it had contracted an offsetting purchase or sale. Petitioner assumed a market risk if it had not done so.

petitioner's large stock investments in microcap companies, after the market crash in 1987 and extending through the 1990s, resulted in gains for petitioner.

Although petitioner was a relatively small company, during the 1990s it acted as a market maker for several hundred convertible securities. It listed and traded a much greater number of those securities than its competitors. Because petitioner was a boutique dealer in convertible securities, Mr. Wechsler himself often would deal with and advise some of petitioner's better customers. During the 1980s, he developed and improved a computer software program for petitioner to keep track of the convertible securities that it listed and traded.

In the spring of 1997, petitioner formally adopted a plan to reduce its institutional and convertible bond business and concentrate on its own proprietary trading and short-term and long-term investments. Even before its formal adoption of this plan, Mr. Wechsler had begun to change the focus of petitioner's business in this manner. By 1997, Mr. Wechsler realized that the prior advantages petitioner enjoyed as a market maker in the convertible securities market no longer applied and that petitioner faced increasing competition from a number of much larger securities investment and trading companies. Among other things, by the 1990s some major investment and trading companies expanded into the convertible securities market as market makers.

By that time, computerized convertible bond trading programs were readily available, and trading in convertible securities came to be conducted in great measure electronically. That diminished petitioner's prior competitive advantage from Mr. Wechsler's expertise and reputation as a market maker in hundreds of convertible securities and the longstanding business relationships that Mr. Wechsler had with various individuals in the financial sector. Price competition in a number of convertible securities increased among various market makers, and typically how good a price a market maker quoted for those securities became the controlling factor for potential customers in selecting a particular market maker for a transaction. Also, generally, trades came to involve larger dollar amounts, resulting in larger capital requirements for market makers in convertible securities. From 1990 through about 1997, petitioner listed and traded approximately 350 convertible securities. Thereafter, petitioner sharply reduced its participation and role as a market maker in the convertible securities market while continuing to act as a market maker in 30 to 50 convertible securities and perhaps a half-dozen stocks.

<u>Duties and Work Performed by Certain Officers and Individuals</u>

<u>Mr. Wechsler</u>

Since 1988, Mr. Wechsler has been petitioner's principal manager and has made all major financial decisions concerning

petitioner. As previously discussed, he was petitioner's president and chairman of its board. He was intimately involved in managing petitioner's business, closely supervised all of petitioner's trading and investment activities in debt and equity securities, and worked long hours. Among other things, he: (1) Conducted all of petitioner's marketing, (2) determined the securities for which petitioner would be a market maker, and (3) managed petitioner's investment portfolio. Besides Mr. Wechsler, from 1992 through 1997 petitioner had two salesmen, three to five traders, and one to five assistants working at its trading desk. Mr. Wechsler spent most of his time at work either in petitioner's trading room or in his office adjoining the trading room, which was only 4 to 5 feet away from the trading desk. Petitioner's trading room was a large room that contained a large trading desk that had four seats on each side and two seats at each end, with a telephone at each seat position. All of the traders, institutional sales representatives, and certain support staff sat together in the trading room. The traders sat at the central seats of the trading desk, with each trader generally having five computers. When Mr. Wechsler was in his office, his office door into the trading room was open 99 percent of the time.

In managing petitioner, Mr. Wechsler was assisted by three individuals who had worked for petitioner for a number of years:

(1) Philip Glickman (Mr. Glickman), (2) Richard Zeeman (Mr. Zeeman), and (3) Ricky Solomon (Mr. Solomon). In the next lower level of petitioner's senior employees were Jay Mittentag (Mr. Mittentag) and Evan Lobel (Mr. Lobel).

In addition, petitioner paid Gilbert (Mr. Wechsler's brother) $80,359 and $108,097 during its 1992 and 1993 fiscal years, respectively. Petitioner deducted those payments on its 1992 and 1993 Federal income tax returns as compensation paid for services. Those deductions are at issue.

Mrs. Wechsler began working for petitioner during its 1999 fiscal year. A portion of the $486,154 that petitioner paid to her and deducted as compensation paid for her services during that year is at issue.

Mr. Glickman

Mr. Glickman started working for the partnership (petitioner's predecessor) in 1959 as a clerk/trainee, primarily assisting Mr. Wechsler's father. Mr. Glickman later worked as a senior trader for petitioner, until the mid-1980s, when he became an institutional salesman for convertible bonds. He served as petitioner's vice president from 1967 until June 2, 1988, when he was appointed its executive vice president. He served on petitioner's board from 1986 until his retirement from petitioner on May 31, 1997.

Mr. Zeeman

Mr. Zeeman started working for the partnership in 1963 as a clerk/trainee assisting Charles Ogden (a partner) and then Mr. Krumholz's father (another partner). Mr. Zeeman later became a senior trader for petitioner and was registered with the NASD as a registered representative, a principal, and a financial operations principal (FINOP). From the mid-1980s until 1992, he was in charge of petitioner's back office operation. From June 1, 1991, through May 1997, when he was terminated, Mr. Zeeman's duties were primarily administrative, and he largely functioned as petitioner's chief financial officer. At various periods during the years at issue, he served as petitioner's secretary, treasurer, vice president, or executive vice president. Following petitioner's outsourcing of its back office operation in December 1992, until his termination from petitioner in May 1997, he was responsible for ensuring that petitioner's books and records (including its monthly Financial and Operational Combined Uniform Single (FOCUS) reports) were prepared and that petitioner was in compliance with other financial and reporting requirements imposed by the NASD and the SEC.

Mr. Solomon

Mr. Solomon joined petitioner in 1983. He was a registered representative with the NASD and rose relatively quickly working for petitioner. He was given significant authority to trade and

maintain large trading and investment positions. Nevertheless, he consulted closely with Mr. Wechsler while performing those trading and investment activities. He became petitioner's vice president in 1988 and became a member of petitioner's board in 1992.

### Mr. Mittentag

Mr. Mittentag began working for petitioner in the 1960s as a back office clerk. He became an assistant cashier for petitioner and later its cashier. He became petitioner's chief financial officer in October 1998. He is registered with the NASD as a FINOP.

### Mr. Lobel

Mr. Lobel began working for petitioner in 1987 as a clerk/ trainee. He became a senior trader and then a trader/analyst. He had limited discretion to trade and make investments for petitioner. He also made recommendations as to investments to Mr. Wechsler and recommendations as to trading to Mr. Wechsler and Mr. Solomon. He became a FINOP in June 1997. He resigned from petitioner on August 24, 1998.

### Gilbert

During petitioner's 1992 and 1993 fiscal years, Gilbert worked as a lighting designer at the Metropolitan Opera. He had been a lighting designer there for 19 years. He did not spend time in petitioner's office every day. Petitioner did not

provide him with access to its computer system, nor did it provide him its computer program allowing him to access the system from outside petitioner's office.

Mrs. Wechsler

Mrs. Wechsler previously worked for a broker-dealer in Dallas, Texas, where Mr. Wechsler met her. She moved to New York City in 1971 and then married Mr. Wechsler. Until petitioner hired her on July 14, 1998, she had not worked outside her home since the late 1970s. Petitioner agreed to pay her compensation of at least $500,000 a year. On July 14, 1998, she became petitioner's secretary and a member and vice chairman of petitioner's board of directors. During petitioner's 1999 fiscal year, she devoted 70 percent of her time to office management and 30 percent to portfolio research. She became a full registration/general securities representative in February 1999 and a general securities principal in June 1999.

Common and Preferred Stock Ownership in Petitioner

Petitioner has had outstanding both common and preferred shares of stock. Since 1986, Mr. Wechsler has owned a majority of the outstanding common shares of petitioner and has held sufficient shares to elect a majority of petitioner's directors. From May 31, 1997, through May 31, 1999, the holders of petitioner's preferred stock have had the authority to elect one of petitioner's directors but have never exercised that

authority.

From its incorporation in 1962 through May 31, 1999, petitioner has never paid cash dividends with respect to its common stock. On July 6, 1984, petitioner distributed 14 shares of its preferred stock with respect to each share of its common stock. It has not since then distributed preferred shares with respect to its common stock. Petitioner paid cash dividends on its preferred stock in 1979, 1980, 1981, 1982, 1983, 1984, and 1985. From 1986 through May 31, 1999, petitioner did not pay dividends on its preferred stock.

As previously discussed, Mr. Wechsler's father died in June 1986 and bequeathed his 80 common shares in petitioner to Mr. Wechsler, making Mr. Wechsler owner of 160 of petitioner's then-outstanding 255 common shares. The father left his preferred shares in petitioner to two trusts primarily for the benefit of his wife, Mr. Wechsler's mother, with Mr. Wechsler and Gilbert (the two sons of the father and mother) as remaindermen. The father's estate elected to pay the Federal estate tax it owed under the installment provisions of section 6166. Mr. Wechsler's mother died on May 3, 1989, and her estate also elected to pay the Federal estate tax it owed under the installment provisions of section 6166. Mr. Wechsler and Gilbert were cofiduciaries of the father's estate, the mother's estate, and the trusts that their father and mother established.

As of June 1, 1990, the father's estate, the mother's estate, and the trusts collectively owned 3,188.55 preferred shares in petitioner.  Over the period covering its 1991 through 1999 fiscal years, petitioner redeemed 878.55 of these 3,188.55 shares as follows:

| FYE May 31 | Number of Shares Redeemed | Total Payment | Price Per Share |
|---|---|---|---|
| 1991 | 58.55 | $104,512 | $1,785.00 |
| 1992 | 45.00 | 83,026 | 1,845.02 |
| 1993 | 347.00 | 649,230 | 1,870.98 |
| 1994 | 112.00 | 218,354 | 1,949.59 |
| 1995 | 157.00 | 316,575 | 2,016.40 |
| 1996 | 125.00 | 258,420 | 2,067.36 |
| 1997 | -- | -- | -- |
| 1998 | 19.00 | 41,325 | 2,175.00 |
| 1999 | 15.00 | 33,975 | 2,265.00 |

As of June 30, 1990, and May 31, 1999, legal title to petitioner's outstanding preferred shares was held as follows:

| Holder | June 30, 1990 | May 31, 1999 |
|---|---|---|
| Mr. Wechsler's father's and mother's estates | 3,188.55 | 2,310.00 |
| Mr. Wechsler | 1,549.75 | 1,549.75 |
| Mr. Glickman | 140.00 | 140.00 |
| Mr. Zeeman or his estate[1] | 70.00 | 70.00 |
| Total | 4,948.30 | 4,069.75 |

[1] Mr. Zeeman died on Apr. 27, 1999.

From September 3, 1999, through December 6, 2000, petitioner redeemed another 200 of the 3,185.55 preferred shares that Mr. Wechsler's father previously had owned as follows:

|  | Number of Preferred |
| Date | Shares Redeemed |
| Sept. 3, 1999 | 5 |
| Mar. 9, 2000 | 42 |
| Sept. 14, 2000 | 11 |
| Dec. 6, 2000 | 142 |
| Total | 200 |

After petitioner's redemption of the above 200 shares, 2,110 of the 3,188.55 preferred shares that the father had owned remained outstanding. Mr. Wechsler and Gilbert (as co-fiduciaries of both their father's and mother's estates) determined that the two estates had satisfied the Federal estate taxes they owed. Mr. Wechsler and Gilbert further determined they were each entitled to 1,055 of the remaining 2,110 preferred shares that their father had owned in petitioner. On December 7, 2000, petitioner redeemed Gilbert's 1,055 preferred shares for $2,299,099.25, or $2,179.24 a share. Mr. Wechsler's 1,055 preferred shares were not formally transferred to him or redeemed. As of the time of the trial, the certificates representing these 1,055 preferred shares that Mr. Wechsler inherited remained in the name of the father's estate, the mother's estate, or the trusts.

From June 1, 1991, through August 7, 1997, petitioner's then 180 outstanding shares of common stock were owned as follows:

| Shareholder | Number of Common Shares Owned |
|---|---|
| Mr. Wechsler | 160 |
| Mr. Glickman | 10 |
| Mr. Zeeman | 8 |
| Mr. Solomon | 2 |
| Total | 180 |

Mr. Glickman and Mr. Zeeman ceased to be employed by petitioner on May 31, 1997. On August 1, 1997, petitioner exercised its rights to purchase their common shares under stock purchase agreements that it had negotiated with them, and it offered them $97,286.59 a share for that stock.[3] It further offered to purchase their preferred shares for a price equal to those shares' stated redemption value of $1,000 a share, plus accumulated accrued dividends. On August 1, 1997, petitioner also offered to purchase Mr. Solomon's common shares for $97,286.59 a share. Mr. Solomon accepted petitioner's offer and petitioner redeemed his shares on August 7, 1997. Mr. Glickman and Mr. Zeeman (and Mr. Zeeman's estate after Mr. Zeeman's death on April 27, 1999) litigated in a New York State court petitioner's determination of a price for their common stock under the stock purchase agreements. That litigation was settled

---

[3] The stock purchase agreements between petitioner and Mr. Glickman, Mr. Zeeman, and Mr. Solomon each generally provided that petitioner would repurchase all of the individual's common shares upon his death or termination of employment with petitioner at a price equal to the book value of those shares as of the last day of the month preceding the holder's death or termination of employment.

in November 1999, and petitioner redeemed the common shares owned by Mr. Glickman and Mr. Zeeman's estate on November 30, 1999, paying him and the estate $97,286.59 a share for the stock, plus accrued interest from May 31, 1997.  On November 30, 1999, petitioner purchased the preferred shares that previously had been owned by Mr. Glickman and Mr. Zeeman at a price equal to the sum of those shares' redemption value of $1,000 a share, plus accumulated accrued dividends as of May 31, 1997, plus accrued interest from May 31, 1997.

After November 30, 1999, Mr. Wechsler owned all 160 outstanding common shares of stock in petitioner.  Following petitioner's redemption of Gilbert's 1,055 preferred shares on December 7, 2000, discussed supra, Mr. Wechsler owned all the outstanding preferred shares of stock in petitioner.

Compensation Paid to Upper Level Managers and Employees in the Financial Industry and Petitioner's Payments of Compensation to Mr. Wechsler, Mrs. Wechsler, Gilbert, and Others During Years in Issue

In the financial industry, upper level managers and employees at investment and trading companies typically receive a substantial part of their annual compensation from bonuses that are based upon their company's earnings or profits for that year. In particular, principal managers of companies that enjoy highly profitable years often may be paid bonuses that are a number of times the amounts of their annual salaries.

During its 1992 through 1999 fiscal years, petitioner did not have a written compensation policy as to the payment of either base compensation or bonuses to its employees.

In each fiscal year, petitioner generally paid Mr. Wechsler and its other officers (1) a base salary, (2) a December or holidays bonus and (3) a May or fiscal-yearend bonus. The December bonuses typically were based on petitioner's year-to-date earnings and the assumption of petitioner's continuing profitability for the remainder of that fiscal year. Generally, the December bonuses were smaller than the May bonuses.

Toward the middle of May, Mr. Wechsler prepared a spreadsheet listing all of petitioner's employees and the proposed bonuses and salary adjustments for them. Mr. Wechsler's proposed total May bonuses were based on his estimate of petitioner's realized and unrealized profits for the fiscal year, which he determined primarily by using petitioner's most recent monthly FOCUS reports, though he gave more weight to realized profits because unrealized profits had not been reduced to cash and petitioner wished not to liquidate investment assets. In addition, in determining the proposed May bonuses, Mr. Wechsler took into account, to a small degree, his current expectations and outlooks for the securities industry, petitioner, and petitioner's portfolio.

Generally, petitioner's officers other than Mr. Wechsler did not make bonus recommendations for themselves or petitioner's other employees. While the proposed bonuses would be discussed at a meeting of petitioner's board of directors, Mr. Wechsler made the final decisions regarding the salary and bonuses that petitioner paid to each of its employees and officers, including himself. At no time did petitioner's board of directors reject the compensation that Mr. Wechsler proposed for himself, nor did the board ever authorize him to receive more or less than the amount of compensation that he proposed for himself.

During its 1992 through 1999 fiscal years, petitioner paid Mr. Wechsler a base salary, a December bonus, and a May bonus as follows:

| FYE May 31 | Base Salary | December Bonus | May Bonus | Total Annual Comp. |
|---|---|---|---|---|
| 1992 | $390,000 | $750,000 | $3,250,000 | $4,390,000 |
| 1993 | 390,000 | 2,000,000 | 2,500,000 | 4,890,000 |
| 1994 | 390,000 | 3,000,000 | 3,700,000 | 7,090,000 |
| 1995 | 405,000 | 30,000 | 5,425,000 | 5,860,000 |
| 1996 | 390,000 | -- | 5,000,000 | 5,390,000 |
| 1997 | 390,000 | -- | 1,000,000 | 1,390,000 |
| 1998 | 415,000 | 32,000 | 7,040,000 | 7,487,000 |
| 1999 | 571,694 | 23,076 | 900,000 | 1,494,770 |

Petitioner paid and deducted $80,359 as compensation to Gilbert for its 1992 fiscal year. It paid and deducted $108,097 as compensation to him for its 1993 fiscal year.

Petitioner paid and deducted $486,154 as compensation to Mrs. Wechsler for its 1999 fiscal year. Of that amount, $178,154 was salary, $8,000 was a December bonus, and $300,000 was a May bonus.

During its 1992 through 1997 fiscal years, petitioner paid its then executive vice president, Mr. Glickman, a base salary, a December bonus, and a May bonus as follows:

| FYE May 31 | Base Salary | December Bonus | May Bonus | Total Annual Comp. |
|---|---|---|---|---|
| 1992 | $166,400 | $100,000 | $550,000 | $816,400 |
| 1993 | 166,400 | 250,000 | 400,000 | 816,400 |
| 1994 | 166,400 | 300,000 | 450,000 | 916,400 |
| 1995 | 172,800 | 12,800 | 600,000 | 785,600 |
| 1996 | 166,400 | -- | 600,000 | 766,400 |
| 1997 | 169,600 | -- | 160,000 | 329,600 |

During its 1992 through 1997 fiscal years, petitioner paid Mr. Zeeman (who largely functioned as its chief financial officer and until 1992 headed its back office operation) a base salary, a December bonus, and a May bonus as follows:

| FYE May 31 | Base Salary | December Bonus | May Bonus | Total Annual Comp. |
|---|---|---|---|---|
| 1992 | $156,000 | $100,000 | $550,000 | $806,000 |
| 1993 | 146,000 | 50,000 | 100,000 | 296,000 |
| 1994 | 104,000 | 50,000 | 100,000 | 254,000 |
| 1995 | 108,000 | 8,000 | 115,000 | 231,000 |
| 1996 | 114,000 | -- | 115,000 | 229,000 |
| 1997 | 106,000 | -- | 48,000 | 154,000 |

During its 1992 through 1999 fiscal years, petitioner paid its vice president/executive vice president, Mr. Solomon, a base salary, a December bonus, and a May bonus as follows:

| FYE May 31 | Base Salary | December Bonus | May Bonus | Total Annual Comp. |
|---|---|---|---|---|
| 1992 | $104,000 | $50,000 | $400,000 | $554,000 |
| 1993 | 104,000 | 200,000 | 350,000 | 654,000 |
| 1994 | 104,000 | 300,000 | 400,000 | 804,000 |
| 1995 | 108,000 | 8,000 | 560,000 | 676,000 |
| 1996 | 104,000 | -- | 560,000 | 664,000 |
| 1997 | 130,000 | -- | 300,000 | 430,000 |
| 1998 | 293,500 | 23,080 | 700,000 | 1,016,580 |
| 1999 | 46,160 | -- | -- | 46,160 |

During its 1992 through 1999 fiscal years, petitioner paid Mr. Mittentag (who was its cashier and became its chief financial officer in October 1998) a base salary, a December bonus, and a May bonus as follows:

| FYE May 31 | Base Salary | December Bonus | May Bonus | Total Annual Comp. |
|---|---|---|---|---|
| 1992 | $52,300 | $2,000 | $35,000 | $89,300 |
| 1993 | 55,620 | 8,240 | 37,000 | 100,860 |
| 1994 | 53,560 | 10,000 | 40,000 | 103,560 |
| 1995 | 55,820 | 4,120 | 55,000 | 114,940 |
| 1996 | 58,760 | 4,520 | 55,000 | 118,280 |
| 1997 | 58,760 | 2,260 | 40,000 | 101,020 |
| 1998 | 62,260 | 4,800 | 60,000 | 127,060 |
| 1999 | 79,385 | 3,461 | 40,000 | 122,846 |

During its 1992 through 1999 fiscal years, petitioner paid Mr. Lobel (a senior trader and later a trader/analyst) a base salary, a December bonus, and a May bonus as follows:

| FYE May 31 | Base Salary | December Bonus | May Bonus | Total Annual Comp. |
|---|---|---|---|---|
| 1992 | $51,385 | $3,800 | $100,000 | $155,185 |
| 1993 | 55,350 | 6,150 | 120,000 | 181,500 |
| 1994 | 53,300 | 15,000 | 150,000 | 218,300 |
| 1995 | 55,000 | 4,100 | 160,000 | 219,100 |
| 1996 | 59,800 | 4,600 | 160,000 | 224,400 |
| 1997 | 65,000 | 2,500 | 120,000 | 187,500 |
| 1998 | 168,000 | 16,000 | 250,000 | 434,000 |
| 1999 | 48,000 | -- | -- | 48,000 |

## 1999 Fiscal Year Loans Mr. Wechsler Made to Petitioner

During petitioner's 1999 fiscal year, Mr. Wechsler made several short-term loans to petitioner. He made four cash loans totaling $2,562,400 to petitioner on the dates and in the amounts specified below:

| Date | Amount |
|---|---|
| Sept. 1, 1998 | $797,000 |
| Sept. 2, 1998 | 807,000 |
| Sept. 11, 1998 | 57,100 |
| Oct. 7, 1998 | 901,300 |
| Total | 2,562,400 |

Petitioner repaid these cash loans on the dates and in the amounts specified below:

| Date | Amount |
|---|---|
| Sept. 24, 1998 | $797,000.00 |
| Oct. 8, 1998 | 291,376.54 |
| Oct. 21, 1998 | 1,474,023.46 |
| Total | 2,562,400.00 |

On October 8, 1998, Mr. Wechsler lent petitioner securities with a market value of $1,479,453 (the securities loan). On October 14, 1998, petitioner returned those securities to Mr. Wechsler.

Petitioner did not pay any interest to Mr. Wechsler with respect to either the above cash loans or the securities loan.

Petitioner's 1992 Through 1999 Tax Returns and FOCUS Reports

For its 1992 through 1999 fiscal years, petitioner prepared its Federal income tax returns using an accrual method of accounting. Under that method, securities petitioner held in investment accounts were reflected on the tax return balance sheet at cost and not at fair market value. Up until its 1994 return, petitioner for tax purposes generally carried its securities positions in trading accounts at the lower of cost or market. In 1993, the mark-to-market rules of section 475 were added to the Internal Revenue Code by the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13223, 107 Stat. 481, effective for taxable years ending on or after December 30, 1993. Beginning with its 1994 return, petitioner marked to market all securities held in trading accounts daily, so that immediate realization and recognition of gain or loss resulted.

Petitioner's annual FOCUS reports for its 1992 through 1999 fiscal years incorporate petitioner's audited financial statements, which were required to be prepared in accordance with generally accepted accounting principles (GAAP). Those audited financial statements were prepared in accordance with GAAP except to the extent the balance sheets failed to list as a liability petitioner's deferred taxes computed in accordance with GAAP.

Petitioner's annual FOCUS reports differed from its tax returns in that petitioner's revenue and earnings for purposes of the former were computed by marking to market all securities petitioner then held, including those held for investment.  Cf. sec. 475(b)(1)(A).

On its 1992 through 1999 Federal income tax returns, petitioner reported gross income, total deductions, taxable income or loss, retained earnings, and retained earnings and capital stock as follows:

| FYE May 31 | Gross Income | Total Deductions | Taxable Income (Loss) | Retained Earnings | Retained Earnings and Capital Stock |
|---|---|---|---|---|---|
| 1992 | $13,507,518 | $11,776,469 | $1,731,049 | $10,097,005 | $11,570,519 |
| 1993 | 11,708,935 | 11,740,630 | (31,695) | 9,130,437 | 10,512,068 |
| 1994 | 14,124,390 | 13,738,343 | 386,048 | 8,943,389 | 10,295,362 |
| 1995 | 13,733,608 | 13,607,047 | 126,560 | 9,479,267 | 10,789,667 |
| 1996 | 13,894,468 | 13,880,601 | 13,867 | 8,991,933 | 10,269,234 |
| 1997 | 9,044,532 | 9,161,872 | (117,340) | 8,871,568 | 10,148,869 |
| 1998 | 14,232,286 | 14,003,689 | 228,597 | 8,744,865 | 10,001,047 |
| 1999 | 7,673,379 | 7,264,787 | 406,592 | 8,392,760 | 9,633,942 |

On its annual FOCUS reports for its 1992 through 1999 fiscal years, petitioner reported revenue, expenses, earnings before Federal income tax (EBFIT), retained earnings, and retained earnings and capital stock as follows:

| FYE May 31 | Revenue | Expenses | EBFIT | Retained Earnings | Retained Earnings and Capital Stock |
|---|---|---|---|---|---|
| 1992 | $15,466,673 | $11,544,567 | $3,922,106 | $21,336,807 | $22,810,321 |
| 1993 | 17,834,269 | 11,660,585 | 6,173,684 | 26,923,441 | 28,305,072 |
| 1994 | 11,738,296 | 13,649,167 | (1,910,871) | 24,821,032 | 26,173,006 |
| 1995 | 20,028,281 | 13,623,510 | 6,404,771 | 31,870,981 | 33,181,381 |
| 1996 | 26,768,427 | 13,840,558 | 12,927,869 | 44,546,634 | 45,823,935 |
| 1997 | 4,730,016 | 9,025,627 | (4,295,611) | 40,248,943 | 41,526,244 |
| 1998 | 16,843,524 | 13,931,893 | 2,911,631 | 42,859,076 | 44,115,258 |
| 1999 | (8,513,310) | 7,255,075 | (15,768,385) | 26,949,031 | 28,190,213 |

Adjustments

For the fiscal years in issue, the following table shows the amounts petitioner claimed as deductions for compensation paid to Mr. Wechsler, Mrs. Wechsler, and Gilbert and the amounts respondent allowed:

Mr. Wechsler

| Year | Amount claimed | Amount allowed | Amount disallowed |
|------|----------------|----------------|-------------------|
| 1992 | $4,390,000 | $1,834,000 | $2,556,000 |
| 1993 | 4,890,000 | 1,486,000 | 3,404,000 |
| 1994 | 7,090,000 | 3,665,927 | 3,424,073 |
| 1995 | 5,860,000 | 2,414,067 | [1]3,445,933 |
| 1996 | 5,390,000 | 2,316,344 | 3,073,656 |
| 1997 | 1,390,000 | 1,176,000 | 214,000 |
| 1998 | 7,487,000 | 3,821,000 | 3,666,000 |
| 1999 | 1,494,771 | 1,035,000 | 459,771 |

[1] In the stipulation of facts, the amount of Mr. Wechsler's compensation that was disallowed as a deduction for the 1995 fiscal year is stated to be $3,445,993. In the notice of deficiency, that amount is stated to be $3,445,933. We assume that the $60 difference is due to the parties' error in drafting the stipulation. We accept the amount disallowed in the notice of deficiency as correct.

Mrs. Wechsler

| Year | Amount claimed | Amount allowed | Amount disallowed |
|------|----------------|----------------|-------------------|
| 1999 | $486,154 | $150,000 | $336,154 |

Gilbert

| Year | Amount claimed | Amount allowed | Amount disallowed |
|------|----------------|----------------|-------------------|
| 1992 | $80,359 | -0- | $80,359 |
| 1993 | 108,097 | -0- | 108,097 |

Respondent determined that the amounts disallowed with respect to Mr. Wechsler and Mrs. Wechsler exceeded a reasonable allowance for services rendered within the meaning of section 162. With respect to Gilbert, respondent determined that no amounts were allowable because no information was provided showing any service Gilbert rendered to petitioner.

OPINION

I. Introduction

This case is what is conventionally known as a "reasonable compensation" case. We must determine the deductibility of amounts petitioner claims it paid to three individuals as compensation for personal services rendered to petitioner. There is no dispute as to the fact of the payments; there is a dispute only as to the character of portions of those payments.

II. Applicable Law

Section 162(a)(1) permits a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered". A taxpayer is entitled to a deduction for compensation only if: (1) The payments were reasonable in amount, and (2) the payments were for services actually rendered. Sec. 1.162-7(a), Income Tax Regs. Bonuses paid to employees are deductible "when * * * made in good faith and as additional compensation for services actually rendered by the employees, provided such payments, when added to the

stipulated salaries, do not exceed a reasonable compensation for the services rendered." Sec. 1.162-9, Income Tax Regs.

Because petitioner's place of business is in the State of New York, and barring a stipulation to the contrary, any appeal of this case would be to the Court of Appeals for the Second Circuit. See sec. 7482(b)(1)(B). Therefore, under the doctrine of Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we must apply that court's precedents governing issues of reasonable compensation to the extent that they contradict our precedents.

The question of whether compensation is reasonable is to be resolved upon a consideration of all of the facts and circumstances of the case. E.g., Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155 (1980). Numerous factors have been used in determining the reasonableness of compensation, with no single factor being determinative. See Rapco, Inc. v. Commissioner, 85 F.3d 950, 954 (2d Cir. 1996), affg. T.C. Memo. 1995-128; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267. Those factors considered include, but are not limited to: (1) the employee's role in the company, (2) comparison with other companies, (3) the character and condition of the company, (4) potential conflicts of interest, and (5) internal consistency in compensation. Rapco, Inc. v. Commissioner, supra at 954-955;

Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245-1248 (9th Cir. 1983), revg. T.C. Memo. 1980-282. Where shareholder-officers who are in control of a corporation set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits and a constructive dividend. Home Interiors & Gifts, Inc. v. Commissioner, supra at 1156.

The Court of Appeals for the Second Circuit has adopted an independent investor test whereby the fact-finder must apply the above multifactor test from the perspective of an independent investor. In general, this test questions whether, given the dividends and return on equity enjoyed by a disinterested stockholder, that stockholder would approve the amount of disputed compensation paid to the employee on the basis of the facts of each particular case. See Rapco, Inc. v. Commissioner, supra at 954-955; see also Elliotts, Inc. v. Commissioner, supra at 1247; Haffner's Serv. Stations, Inc. v. Commissioner, T.C. Memo. 2002-38, affd. 326 F.3d 1 (1st Cir. 2003). That test allows us to decide whether the amount of compensation paid to a taxpayer-corporation's shareholder-employees by the corporation would have been the same had they engaged in arm's-length negotiation. See Miller & Sons Drywall, Inc. v. Commissioner, T.C. Memo. 2005-114. One important inquiry is whether this hypothetical independent investor received a fair return on his

or her investment.  See <u>Rapco, Inc. v. Commissioner</u>, <u>supra</u> at 954-955.

In performing our analysis, we review Mr. Wechsler's, Mrs. Wechsler's, and Gilbert's compensation separately because whether the compensation that petitioner paid to each is reasonable depends on the services he or she performed.  See <u>Miller & Sons Drywall, Inc. v. Commissioner</u>, <u>supra</u>.

III.  <u>Expert Reports</u>

A.  <u>Introduction</u>

Both parties offered expert testimony in support of their respective positions concerning reasonable compensation for Mr. Wechsler.  No expert testimony was offered concerning reasonable compensation for either Mrs. Wechsler or Gilbert.

In deciding the reasonableness of compensation, courts often look to the opinions of expert witnesses.  Nonetheless, we are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of sound judgment. <u>Helvering v. Natl. Grocery Co.</u>, 304 U.S. 282, 295 (1938); <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976) (and cases cited thereat), affg. T.C. Memo. 1974-285.  Although we may accept the testimony of an expert in its entirety, see <u>Buffalo Tool & Die Manufacturing Co. v. Commissioner</u>, 74 T.C. 441, 452 (1980), we may be selective in determining what portions of an

expert's opinion, if any, to accept, Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Petitioner and one of its experts, Gilbert E. Matthews, on the one hand, argue that reasonable compensation for Mr. Wechsler should be determined by considering data with respect to 27 broker-dealers that Mr. Matthews surveyed, particularly the averages of the ratios of (1) aggregate compensation to net revenues and (2) aggregate compensation to pretax income before compensation for each broker-dealer. Mr. Matthews compared those averages to ratios similarly computed for petitioner to support his conclusion that, in general, Mr. Wechsler's compensation was reasonable. Respondent and respondent's expert, Scott D. Hakala, on the other hand, maintain that reasonable compensation for Mr. Wechsler should be based upon a typical compensation arrangement given to an asset manager, with Mr. Wechsler receiving 40 percent of the bonus pool.

As will be discussed more fully infra, neither of the foregoing proposed approaches for determining reasonable compensation for Mr. Wechsler (nor that of petitioner's second expert, Paul R. Dorf) is entirely appropriate. In particular, petitioner is not reasonably comparable to the broker-dealers selected by petitioner's expert Mr. Matthews. Also, Mr. Hakala's allocation of 40 percent of the incentive compensation to Mr.

Wechsler substantially undercompensates him for his contributions to petitioner.

We now consider in more detail the testimony of the parties' experts.

B.  Petitioners' Experts

Petitioner offered Gilbert E. Matthews and Paul R. Dorf as experts in compensation practices in the securities industry, and they were accepted as such by the Court.

1.  Gilbert E. Matthews

Mr. Matthews is chairman of the board and senior managing director of Sutter Securities, Inc.  He has more than 40 years of experience working in investment banking.  He was asked to testify with respect to compensation practices in the securities industry and the return on petitioner's common stock.

In attempting to determine customary compensation in the securities industry, Mr. Matthews examined 27 broker-dealers whose stock was publicly traded and their financial statements covering all or a significant portion of the years in issue.  He obtained their financial information from either their annual reports or their registration statements filed with the SEC. Those 27 broker-dealers had average annual net revenues for the periods being examined ranging from $21 million to approximately $3.79 billion.  Of the 27 broker-dealers, the four largest--Lehman Brothers, Paine Webber, Bear Stearns & Co., and A.G.

Edwards--were extremely large companies having, respectively, average annual revenues of $3.79 billion, $3.43 billion, $2.79 billion, and $1.63 billion. The 21st-largest broker-dealer, First of Michigan, had average annual revenues of $109.5 million, and the 22d-largest broker-dealer, Rodman & Renshaw, had average annual revenues of $68.0 million. In contrast, petitioner had average annual net revenues of $13.7 million from June 1, 1991, through May 31, 1998.

Mr. Matthews proceeded by first listing the net revenues, aggregate compensation paid to all employees (aggregate compensation), and pretax income for each of the 27 broker-dealers for each period examined. He then calculated the ratios of (1) aggregate compensation to net revenues and (2) aggregate compensation to pretax income before aggregate compensation for each of those broker-dealers for each of those periods. Next, he calculated average ratios for each of the broker-dealers and averages for the group as a whole. For the group as a whole, the averages of (1) aggregate compensation to net revenues and (2) aggregate compensation to pretax income before compensation were 60.1 percent and 84.1 percent, respectively. He compared those averages to averages similarly computed for petitioner for its 1992 through 1998 fiscal years, which were 60.2 percent (aggregate compensation to net revenues) and 68.9 percent (aggregate compensation to pretax income before compensation).

Mr. Matthews concluded that the average 60.2 percent of its net revenues that petitioner paid in aggregate compensation from 1992 through 1998 was reasonable, since it was virtually equal to the average of 60.1 percent of net revenues paid in aggregate compensation computed for the 27 broker-dealers he examined. He further observed that the average 68.9 percent of its pretax income before aggregate compensation that petitioner paid in compensation from 1992 through 1998 was well below the mean or group average of 84.1 percent of pretax income before aggregate compensation paid in compensation computed for those 27 broker-dealers. He stated that those results indicate that petitioner (1) retained a higher portion of its "discretionary income" (i.e., pretax income before compensation) and (2) paid a lower portion of its "discretionary income" as compensation than did most of the publicly traded broker-dealers. Mr. Matthews added that, in his experience, smaller broker-dealers with a limited range of activities, like petitioner, would pay a larger percentage of their revenues to senior management employees than would larger, more diversified broker-dealers.

Mr. Matthews noted that, for petitioner's 1992 through 1999 fiscal years, Mr. Wechsler's annual compensation represented the following percentages of the aggregate annual compensation petitioner paid to all its employees:

|                | Mr. Wechsler's Comp. as |
| FYE May 31     | % of Aggregate Comp. |
|----------------|-------------------------|
| 1992           | 53.6% |
| 1993           | 60.3 |
| 1994           | 67.3 |
| 1995           | 64.0 |
| 1996           | 63.5 |
| 1997           | 41.2 |
| 1998           | 75.5 |
| 1999           | 43.5 |

Mr. Matthews concluded that Mr. Wechsler was entitled to a major share of the aggregate compensation petitioner paid because Mr. Wechsler was the driving force of petitioner's business and was instrumental in producing most of petitioner's revenue.

Mr. Matthews also testified that petitioner's 1992 through 1999 aggregate compensation amounts represent the following percentages of petitioner's 1992 through 1999 annual net revenues and pretax income before payment of compensation:

| FYE May 31 | Net Revenue (millions) | Pretax Income Before Comp. (millions) | Aggregate Comp. (millions) | Aggregate Comp. as % of Net Revenue | Aggregate Comp. as % of Pretax Income Before Comp. |
|------------|------------------------|----------------------------------------|----------------------------|--------------------------------------|----------------------------------------------------|
| 1992 | $13.97 | $12.1 | $8.18 | 58.6% | 67.6% |
| 1993 | 16.18 | 14.3 | 8.13 | 50.3 | 56.9 |
| 1994 | 10.48 | 8.62 | 10.53 | 100.5 | 122.2 |
| 1995 | 17.17 | 15.58 | 9.18 | 53.5 | 58.9 |
| 1996 | 23.40 | 21.42 | 8.49 | 36.3 | 39.6 |
| 1997 | 0.94 | (.93) | 3.37 | 358.5 | n/a |
| 1998 | 13.81 | 12.82 | 9.91 | 71.8 | 77.3 |
| 1999 | (10.68) | (12.45) | 3.44 | n/a | n/a |

Mr. Matthews opined that the annual compensation petitioner paid to Mr. Wechsler for its 1992, 1993, 1995, and 1996 fiscal years was "clearly reasonable", since the percentages of net revenue and pretax net income before payment of aggregate

compensation that petitioner paid in compensation for those years fell within "industry standards".[4]  By "industry standards", Mr. Matthews was referring to the group average percentages that aggregate compensation represented of net revenues and pretax income before payment of compensation (which, as discussed supra, were 60.2 percent and 84.1 percent, respectively) that he computed for the 27 broker-dealers he examined.  He further opined that petitioner's 1996 fiscal year compensation percentages of 36.3 percent and 39.6 percent were quite low by industry standards.

Mr. Matthews also opined that the annual compensation petitioner paid Mr. Wechsler for its 1997 and 1998 fiscal years was reasonable.  He explained that the higher compensation percentage of 358.5 percent for 1997 was caused by that year's lower net revenue from lower market prices for petitioner's portfolio securities.  He maintained that the compensation percentage for 1997 should be analyzed by combining the financial data for 1996 and 1997.  He computed that the combined aggregate compensation petitioner paid for those 2 years was 48.7 percent of its combined 1996 and 1997 net revenues and 57.9 percent of its combined 1996 and 1997 pretax income before payment of

---

[4]  We read this conclusion (and the similar conclusions for 1997 and 1998) in conjunction with Mr. Matthews's conclusion that Mr. Wechsler was entitled to a major share of the aggregate compensation petitioner paid.

compensation.[5]  He concluded that those aggregate percentages of 48.7 percent and 57.9 percent for 1996 and 1997 were extremely reasonable by industry standards.  Similarly, he claimed that the compensation percentage for 1998 should be analyzed by combining the financial data for 1996, 1997, and 1998, given what he felt was the low aggregate compensation paid for 1996 and 1997.  He computed that, on his suggested aggregate basis, the combined aggregate compensation petitioner paid for those 3 years was 57.1 percent of its combined 1996, 1997, and 1998 net revenues and 65.4 percent of its combined 1996, 1997, and 1998 pretax income before payment of aggregate compensation.[6]  He concluded that those aggregate percentages of 57.1 percent and 65.4 percent for 1996, 1997, and 1998 were reasonable by industry standards.

Mr. Matthews used a somewhat different analysis in opining that the compensation petitioner paid to Mr. Wechsler for fiscal year 1999 was reasonable.  He said that, because petitioner had a negative $10.68 million in net revenue for 1999, the same

---

[5] Combined 1996 and 1997 aggregate compensation paid of $11.86 million, divided by combined 1996 and 1997 net revenues of $24.34 million, equals approximately 48.7 percent; and $11.86 million, divided by combined 1996 and 1997 pretax income before aggregate compensation of $20.49 million, equals approximately 57.9 percent.

[6] Combined 1996, 1997, and 1998 aggregate compensation paid of $21.77 million, divided by combined 1996, 1997, and 1998 net revenues of $38.15 million, equals approximately 57.1 percent; and $21.77 million, divided by combined 1996, 1997, and 1998 pretax income before aggregate compensation of $33.31 million, equals approximately 65.4 percent.

percentages method he employed for its other fiscal years could not be used for 1999, and that it was necessary to consider the "absolute numbers". He noted that Mr. Wechsler was paid $1,494,771 in 1999, which represented 28.6 percent of his average compensation for the prior 7 years, and that his 1999 yearend bonus of $900,000 was 22.6 percent of his average bonus for the prior 7 years. He further noted that Mr. Wechsler made several large interest-free loans to petitioner during its 1999 fiscal year. He reasoned that those loans justified a substantial portion of the $900,000 bonus Mr. Wechsler received for that year. Mr. Matthews concluded that the 1999 compensation petitioner paid Mr. Wechsler was reasonable because of those loans and Mr. Wechsler's services in managing petitioner.

Lastly, Mr. Matthews opined that the 1994 fiscal year compensation of $7.09 million petitioner paid Mr. Wechsler was unreasonable and that reasonable compensation for 1994 would have been $4 million. He noted the aggregate compensation of $10.53 million petitioner paid for 1994 represents 100.5 percent of its net revenue for that year and 122.2 percent of its pretax income before payment of compensation for that year. He further noted that, if Mr. Wechsler's 1994 compensation had been $4 million, rather than $7.09 million, petitioner's adjusted aggregate compensation of $7.44 million ($10.53 million, less $3.09 million) would represent 71.0 percent of its net revenue for that

year and 86.3 percent of its pretax income before payment of compensation for that year.[7]

Additionally, Mr. Matthews determined that petitioner, from its 1992 through 1998 fiscal years, enjoyed a 10.4-percent compounded annual rate of return on its common stock equity, adjusted for deferred taxes.[8]  His computation was as follows:

| FYE May 31 | Common Stock Equity (millions) | Deferred Taxes (millions) | Adj. Common Stock Equity (millions) | Annual Rate of Return | Compounded Annual Rate of Return[1] |
|---|---|---|---|---|---|
| 1991 | $18.234 | $3.701 | $14.533 | -- | -- |
| 1992 | 21.527 | 4.603 | 16.924 | 16.5 | 16.5 |
| 1993 | 27.114 | 7.286 | 19.828 | 17.2 | 16.8 |
| 1994 | 25.012 | 6.912 | 18.100 | (8.7) | 7.6 |
| 1995 | 32.062 | 9.169 | 22.893 | 26.5 | 12.0 |
| 1996 | 44.737 | 14.560 | 30.177 | 31.8 | 15.7 |
| 1997 | 40.440 | 12.849 | 27.591 | (8.6) | 11.3 |
| 1998 | 43.049 | 13.970 | 29.079 | 5.4 | 10.4 |
| 1999 | 27.138 | 7.599 | 19.539 | (32.8) | 3.8 |

[1] Computed using a present-value-future-value formula where:  Present value equals $14.533 million (petitioner's adjusted common stock equity at the beginning of its 1992 fiscal year); future value equals adjusted common stock equity at the end of the period in question; and n equals the number of years from June 1, 1991, through the end of that period.

Mr. Matthews opined that an independent investor would be satisfied with this 10.4-percent compounded annual rate of

---

[7]  Adjusted aggregate compensation of $7.44 million, divided by net revenue of $10.48 million, equals approximately 71.0 percent; and $7.44 million, divided by pretax income before payment of aggregate compensation of $8.62 million, equals approximately 86.3 percent.

[8]  Petitioner's 1991 fiscal year annual FOCUS report reflects preferred stock equity of $1,294,782 as of May 31, 1991. Petitioner's 1998 fiscal year annual FOCUS report reflects preferred stock equity of $1,067,652 as of May 31, 1998.  Its 1999 fiscal year annual FOCUS report reflects preferred stock equity of $1,052,652 as of May 31, 1999.

return, maintaining:  "This rate of return would be highly satisfactory to most equity investors."[9]

    2.  <u>Paul R. Dorf</u>

Mr. Dorf is managing director of Compensation Resources, Inc., which he describes as a human resources consulting firm specializing in compensation consulting.  He has 40 years of human resources and compensation experience, including 10 years in various positions as an executive with a number of corporations and 25 years heading the executive compensation consulting businesses of several major accounting and actuarial/benefit consulting firms.

Mr. Dorf could not find any broker-dealers that were reasonably comparable to petitioner.  Mr. Dorf testified that, in his research, he found no published surveys or publicly available data with respect to companies similarly situated and of similar size to petitioner.  He testified that, although, private companies similar to petitioner might exist, generally data on such private companies is not available.  He stated that, in the absence of data on companies reasonably comparable to petitioner, he would analyze the reasonableness of Mr. Wechsler's compensation on the basis of other factors in the multifactor test used by the courts, the financial and other available

---

[9] Mr. Matthews concedes that the compound growth rate fell in fiscal 1999, but he states that it "recovered dramatically" in 2000.

information concerning petitioner and Mr. Wechsler, and the facts and circumstances of the situation presented.

Mr. Dorf examined the sources of petitioner's income for the years at issue and included the following chart in his expert report:

| FYE May 31 | Commissions | Principal Transactions | Dividends/ Interest | Other | Total |
|---|---|---|---|---|---|
| 1992 | $24,567 | $11,118,059 | $3,203,830 | $1,120,217 | $15,466,673 |
| 1993 | 27,071 | 12,288,119 | 4,017,604 | 1,501,475 | 17,834,269 |
| 1994 | 67,964 | 8,356,715 | 3,042,308 | 271,309 | 11,738,296 |
| 1995 | 64,729 | 15,628,125 | 3,421,921 | 913,506 | 20,028,281 |
| 1996 | 70,912 | 21,843,852 | 3,641,947 | 1,211,716 | 26,768,427 |
| 1997 | 106,213 | 135,729 | 3,011,003 | 1,477,071 | 4,730,016 |
| 1998 | 24,066 | 14,243,962 | 1,111,818 | 1,463,678 | 16,843,524 |
| 1999 | 13,124 | (8,942,848) | 254,813 | 161,601 | (8,513,310) |
| Total | 398,646 | 74,671,713 | 21,705,244 | 8,120,573 | 104,896,176 |

Mr. Dorf examined and analyzed petitioner's annual revenues and retained earnings from 1991 through 2000 and Mr. Wechsler's compensation for the 1992 through 1999 years in issue, as follows:

| FYE May 31 | Retained Earnings | Percentage Change | Revenue | Percentage Change | Mr. Wechsler's Total Comp. | Percentage Change |
|---|---|---|---|---|---|---|
| 1991 | $18,043,103 | -- | $14,763,269 | -- | No data | -- |
| 1992 | 21,336,807 | 18% | 15,466,673 | 5% | $4,390,000 | -- |
| 1993 | 26,923,441 | 16 | 17,834,269 | 15 | [1]4,905,000 | 12% |
| 1994 | 24,821,032 | -8 | 11,738,296 | -34 | 7,090,000 | 45 |
| 1995 | 31,870,981 | 28 | 20,028,281 | 71 | [1]5,875,000 | -17 |
| 1996 | 44,546,634 | 40 | 26,768,427 | 34 | 5,390,000 | -8 |
| 1997 | 40,248,943 | -10 | 4,730,016 | -82 | 1,390,000 | -74 |
| 1998 | 42,859,076 | 6 | 16,843,524 | 256 | 7,487,000 | 439 |
| 1999 | 26,949,031 | -37 | (8,513,310) | n/a | 1,494,771 | -80 |
| 2000 | 50,887,981 | 88 | 15,693,799 | n/a | No data | No data |

[1] As determined in our findings, Mr. Wechsler's actual total annual compensation for 1993 was $4,890,000 and his actual total annual compensation for 1995 was $5,860,000.

Mr. Dorf concludes:

> There appears to be a relationship between * * * [petitioner's] performance and Mr. Wechsler's compensation levels. While compensation levels in 1994 and 1998 were higher than expected in light of the decrease in Fiscal Year End performance of * * *

[petitioner], I believe that the average compensation received by Mr. Wechsler over the eight-year period, $4,752,721, is justified and reasonable based on industry standards and taking into consideration the full scope of Mr. Wechsler's responsibilities, and his integral involvement in the financial profitability of the Company.

Mr. Dorf did not perform an analysis of whether a hypothetical independent investor would have been satisfied with the rate of return on that investor's investment in petitioner. He did, however, testify that, while petitioner's other officer-shareholders Mr. Glickman, Mr. Zeeman (and Mr. Zeeman's estate), and Mr. Solomon were not independent investors as such, they had done well on their respective investments in petitioner's common stock when they sold their shares back to petitioner in August 1997 or November 1999. He acknowledged that their shares were not valued at market prices but essentially had been valued under a formula prescribed by an agreement between each of them and petitioner. See further discussion of this point infra note 11.

With respect to the approach of petitioner's first expert, Mr. Matthews, Mr. Dorf testified that Mr. Matthews's approach in drawing an analogy between petitioner and 27 larger (some substantially larger) companies was unreliable because of the disparity in size between the subject company (petitioner) and the comparables selected by Mr. Matthews. Mr. Dorf explained that, in selecting comparable companies, he seeks companies that range from 50 percent to 200 percent the size of the subject

company in terms of assets, revenues, and net equity.  He stated
that, when comparable companies in that range are found, a direct
comparison of the subject company to those companies may be made
and reliable conclusions may be drawn concerning the
reasonableness of the compensation paid by the subject company.
He testified that, when companies disproportionately greater in
size (beyond that range) are used and compared to the subject
company, any conclusions drawn with respect to the reasonableness
of the compensation paid by the subject company are likely to be
inaccurate and unreliable.

C.  Respondent's Expert, Scott D. Hakala

Scott D. Hakala is a principal and director of CBIZ
Valuation Group, Inc., an appraisal, financial advisory, and
litigation support firm.  Mr. Hakala has a doctorate in
economics, has worked as an economist and financial analyst, and
has testified on numerous occasions as an expert witness on
valuation and other business matters.  The Court accepted him as
a compensation expert.

Mr. Hakala opined that petitioner substantially
overcompensated Mr. Wechsler during the years in issue.  He
believed that Mr. Wechsler not only was handsomely compensated in
petitioner's very profitable years but also received high bonuses
even in petitioner's down years, including its loss years.  He
reasoned that an independent investor would object to such

compensation practices because they would place that investor in the position of absorbing all of the downside in petitioner's bad years while not adequately allowing that investor to benefit from and share in the upside in petitioner's good years.

Mr. Hakala suggested a method for reasonably compensating Mr. Wechsler and petitioner's other top managers under which Mr. Wechsler and those managers, in addition to their salaries, would receive annual bonuses totaling 20 percent of petitioner's profits for that year before payment of bonuses. Mr. Hakala explained that his approach would allow an independent investor to obtain most of the profits from petitioner's good years, yet require that investor to absorb all of the downside from petitioner's bad years. He added that incentive compensation for hedge fund managers is commonly set at 20 percent of the fund's annual trading profits. Mr. Hakala further determined that his prescribed annual "bonus pool" money for petitioner's managers would then be allocated 40 percent to Mr. Wechsler and 60 percent to the other managers. He based that allocation on certain surveys of other finance industry companies in which the highest paid officer in a surveyed company typically received around 30 percent to 40 percent of total officer compensation. Many of the companies covered in those surveys were much larger than petitioner.

Mr. Hakala opined that reasonable compensation for Mr. Wechsler for petitioner's 1992 through 1999 fiscal years would be as follows:

| FYE May 31 | Base Salary | Bonus | Total Compensation |
|------------|-------------|-------|--------------------|
| 1992 | $390,000 | $776,768 | $1,166,768 |
| 1993 | 405,000 | 961,895 | 1,366,895 |
| 1994 | 390,000 | 511,130 | 901,130 |
| 1995 | 420,000 | 1,053,086 | 1,473,086 |
| 1996 | 390,000 | 1,536,230 | 1,926,230 |
| 1997 | 390,000 | -- | 390,000 |
| 1998 | 415,000 | 877,817 | 1,292,817 |
| 1999 | 571,694 | -- | 571,694 |

IV. Application of Reasonable Compensation Factors

A. Role in the Company

This factor focuses on the employee's importance to the success of the business. Pertinent considerations include the employee's position, hours worked, and duties performed and the general importance of the employee to the company. Rapco, Inc. v. Commissioner, 85 F.3d at 954-955; Elliotts, Inc. v. Commissioner, 716 F.2d at 1245.

Since at least as early as 1988, Mr. Wechsler has been petitioner's key employee and the primary reason for its overall success. He has worked long hours, been intimately involved in managing petitioner's business, and closely supervised all of petitioner's investment and trading activities.

In contrast to the evidence concerning Mr. Wechsler, the evidence is sketchy concerning the work performed by Mrs.

Wechsler and Gilbert, the hours they worked, and their importance to petitioner's business.  Petitioner offered no testimony from either Mrs. Wechsler or Gilbert.  Although Mrs. Wechsler had previously worked in the financial industry, she had not worked outside her home from the late 1970s until July 14, 1998, when petitioner hired her and agreed to pay her minimum annual compensation of about $500,000.  Upon being hired by petitioner, she became petitioner's secretary and a director.  She became a full registration/general securities representative in February 1999 and a general securities principal in June 1999.  Mr. Wechsler estimated that during petitioner's 1999 fiscal year she devoted 70 percent of her time to office management and 30 percent to portfolio research.

The credible evidence of record is even more vague concerning what, if any, "consulting work" Gilbert performed for petitioner during petitioner's 1992 and 1993 fiscal years. Gilbert already worked full time as a lighting designer at the Metropolitan Opera.  In his testimony, Mr. Wechsler essentially claimed that Gilbert spent an unspecified amount of time in petitioner's office, consulted with Mr. Wechsler on scientific and technical matters, and was also going to help introduce Mr. Wechsler to potential investors (ostensibly people whom Gilbert knew from working at the Metropolitan Opera over the years) in the hedge fund Mr. Wechsler was then contemplating establishing.

We find Mr. Wechsler's testimony self-serving and unconvincing.[10]
We note that petitioner offered no other evidence (e.g.,
testimony from Gilbert, petitioner's other employees, or
potential investors) that Gilbert performed any services for
petitioner.  We infer that petitioner's failure to offer such
evidence means such evidence would have been unfavorable to
petitioner's case.  See Wichita Terminal Elevator Co. v.
Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th
Cir. 1947).

This factor supports petitioner with respect to the
compensation paid to Mr. Wechsler and respondent with respect to
the compensation paid to Mrs. Wechsler and Gilbert.

---

[10] Mr. Wechsler acknowledged that petitioner's 1992 and
1993 payments to Gilbert were, in unspecified part, for Gilbert's
agreeing to the estate tax installment payment elections made by
their father's and mother's estates.  Mr. Wechsler explained that
Gilbert (as either cofiduciary or cobeneficiary of their parents'
respective estates and the trusts established by their father)
greatly helped petitioner and Mr. Wechsler by agreeing to elect
to pay the estate taxes owed by the two estates on the
installment basis.  He said that the installment tax payment
elections allowed petitioner to keep more of its capital to use
in its business, because petitioner then did not have to redeem
immediately substantially more preferred shares in order to pay
the estate taxes owed.  Gilbert's actions as a cofiduciary of the
estates in making the elections, however, do not constitute work
performed for petitioner.  Petitioner does not argue that its
payments to Gilbert for his agreeing to the installment payment
elections are otherwise deductible under sec. 162 as  ordinary
and necessary business expenses (other than compensation)
directly connected with or proximately resulting from
petitioner's business.  See secs. 161, 162(k), 261, 263;
Kornhauser v. United States, 276 U.S. 145, 153 (1928).

B.  <u>Comparison With Other Companies</u>

This factor compares the employee's compensation with that paid by similar companies for similar services.  <u>Rapco, Inc. v. Commissioner</u>, <u>supra</u> at 954-955; <u>Elliotts, Inc. v. Commissioner</u>, <u>supra</u> at 1246; see sec. 1.162-7(b)(3), Income Tax Regs.

The record reflects that petitioner functioned as a broker-dealer during all the years in issue, that it had substantial investments in micro-cap stocks as well as other securities during those years, and that it sharply reduced its activities as a broker-dealer in 1997 to concentrate on its own trading and investments.  We find that the parties' experts failed to show that their surveys identified any securities investment and trading companies similar to petitioner whose chief executive officers or principal managers rendered services similar to Mr. Wechsler's.  Indeed, petitioner's second expert, Mr. Dorf, acknowledged that petitioner is very different from other broker-dealers and that he could not find any broker-dealers reasonably comparable to petitioner against whom petitioner could directly be compared or measured.  Consequently, with respect to the reasonableness of the compensation paid by petitioner to Mr. Wechsler, this factor is neutral.  <u>Labelgraphics, Inc. v. Commissioner</u>, 221 F.3d 1091, 1098 (9th Cir. 2000), affg. T.C. Memo. 1998-343.

Also, no expert testimony was given concerning the reasonableness of the compensation paid by petitioner to either Mrs. Wechsler or Gilbert.  No attempt was made to compare the compensation paid to Mrs. Wechsler or Gilbert with the compensation paid to employees rendering similar services in similar companies, nor is the Court convinced that their services were unique, making any attempt at comparisons fruitless.  As with petitioner's failure to offer evidence with respect to the services Gilbert performed for petitioner, we infer that petitioner's failure to offer comparative evidence means such evidence would have been unfavorable to petitioner.  See Wichita Terminal Elevator Co. v. Commissioner, supra.  Consequently, with respect to the compensation petitioner paid to Mrs. Wechsler and Gilbert, this factor is negative.

C.   Character and Condition of the Company

This factor considers the company's character and condition. Relevant considerations are the company's size as measured by its sales, net income, or capital value; the complexities of the business; and general economic conditions.  Rapco, Inc. v. Commissioner, 85 F.3d at 954-955; Elliotts, Inc. v. Commissioner, 716 F.2d at 1246.

Petitioner was a relatively small broker-dealer that had secured a prominent market niche as a specialist in convertible securities.  It enjoyed an excellent, longstanding reputation for

its expertise as a market maker in convertible securities. From 1992 until 1997, petitioner listed and traded as a market maker approximately 350 convertible securities, a far greater number of securities than its competitors.

In 1992, petitioner moved its office from New York City to Mt. Kisco, New York. Shortly thereafter, it outsourced its back-office operation, resulting in a substantial reduction in the number of its employees. Even before 1997, petitioner and Mr. Wechsler had started to change the focus of petitioner's business on account of changed business conditions for market makers in convertible securities. In 1997, petitioner sharply reduced the number of convertible securities and stocks it listed and traded as a market maker and decided to emphasize trading and investing for its own account. That resulted in a further decrease in petitioner's employees and management team members.

In sum, both before and during the years in issue, petitioner was a successful, well-managed, but relatively small, investment and trading company with a very lean management team. This factor supports petitioner.

D. Conflict of Interest

This factor examines whether a relationship exists between the company and the employee that might permit the company to disguise nondeductible corporate distributions as section 162(a)(1) compensation payments. Thus, close scrutiny must be

given where the paying corporation is controlled by the compensated employee, as in the instant case. Rapco, Inc. v. Commissioner, supra at 954-955; Elliotts, Inc. v. Commissioner, supra at 1246-1247. Also, the existence of a family relationship may indicate that the terms of a compensation arrangement may not have been the result of a free bargain. Elliotts, Inc. v. Commissioner, supra at 1246. However, the mere fact that the individual whose compensation is under scrutiny is the sole shareholder of the company, even when coupled with an absence of dividend payments, "does not necessarily lead to the conclusion that the amount of compensation is unreasonably high." Id. Instead, the fact finder is further to adopt the perspective of an independent investor in determining whether the investor would be satisfied with the company's return on equity after the compensation in issue was paid. Id. at 1247.

Clearly, Mr. Wechsler's relationship to petitioner influenced petitioner's payments of compensation to Mrs. Wechsler and Gilbert, some or all of which were not reasonable compensation for services rendered to petitioner and, we suspect, were disguised dividends to Mr. Wechsler. We thus carefully examine petitioner's corporate motives in making the payments in question to Mr. Wechsler.

As set forth in our findings, principal managers of financial industry investment and trading companies typically

receive a substantial portion of their annual compensation from incentive compensation or bonuses tied to their company's earnings and profitability for that year. Yet, contrary to petitioner's experts' (Messrs. Matthews's and Dorf's) claims, no strong linkage existed between petitioner's financial performance in a given year and Mr. Wechsler's bonuses and total compensation for that year. We agree with respondent's expert, Mr. Hakala, that petitioner's compensation practice as to Mr. Wechsler would put an independent investor in the highly disadvantageous position of absorbing all the downside in petitioner's bad years while causing that investor to share inadequately in the upside in petitioner's good years. In our opinion, all of the foregoing strongly indicates that the $37.992 million petitioner paid Mr. Wechsler from 1992 through 1998 was not reasonable compensation, and he was overcompensated during the 1992 through 1999 years in issue. See Rapco, Inc. v. Commissioner, supra at 955 (sustaining Tax Court's determination as to unreasonableness of controlling shareholder's compensation because, among other things, (1) taxpayer-corporation's compensation scheme was bonus-heavy and salary-light, suggesting masked dividends, (2) taxpayer could point to no consistent method for bonus calculation, and (3) as ultimate decision-maker as to his own pay, controlling

shareholder had a definite conflict of interest).[11]  This factor strongly supports respondent.

E.  Internal Consistency in Compensation

This factor focuses on whether the compensation was paid pursuant to a structured, formal, and consistently applied program.  Bonuses not paid pursuant to such plans are suspect.  Similarly, bonuses paid to controlling shareholders are also suspect "if, when compared to salaries paid non-owner management, they indicate that the level of compensation is a function of ownership, not corporate management responsibility."  Elliotts, Inc. v. Commissioner, 716 F.2d at 1247; see also Rapco, Inc. v. Commissioner, 85 F.3d at 954.

---

[11]  On brief, petitioner argues that Mr. Wechsler's compensation for most of the years in issue should be considered reasonable because three other unrelated shareholders in petitioner--Mr. Glickman, Mr. Zeeman, and Mr. Solomon-- purportedly approved that compensation.  Petitioner's reliance upon Mr. Glickman's, Mr. Zeeman's and Mr. Solomon's alleged approval of the compensation petitioner paid Mr. Wechsler, however, is misplaced.  Mr. Wechsler was petitioner's controlling shareholder and owned a majority of its common shares sufficient to elect a majority of petitioner's directors.  In contrast, Mr. Glickman, Mr. Zeeman, and Mr. Solomon (who were also full-time employees and officers of petitioner) owned small minority stock interests in petitioner.  Their continued employment was subject to Mr. Wechsler's authority.  Mr. Glickman, Mr. Zeeman, and Mr. Solomon thus cannot substitute for the inactive, hypothetical independent investor under the independent investor test adopted by the Court of Appeals for the Second Circuit and other courts. See Rapco, Inc. v. Commissioner, 85 F.3d 950, 954-955 (2d Cir. 1996), affg. T.C. Memo. 1995-128; Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245, 1247 (9th Cir. 1983), revg. T.C. Memo. 1980- 282; Haffner's Serv. Stations, Inc. v. Commissioner, T.C. Memo. 2002-38, affd. 326 F.3d 1 (1st Cir. 2003).

As previously discussed, Mr. Wechsler was paid large bonuses even in petitioner's down and loss years.  Contrary to the claims of petitioner's experts, no strong linkage existed between the bonuses and total compensation paid to Mr. Wechsler for a given year and petitioner's financial performance for that year.  Neither petitioner nor its experts established any consistent method for calculating Mr. Wechsler's bonuses for the years in issue.[12]  See Rapco, Inc. v. Commissioner, supra at 955.

With respect to Mrs. Wechsler's compensation for petitioner's 1999 fiscal year, she started working for petitioner that year and also served as petitioner's secretary and a member of its board.  Petitioner paid her a $178,154 salary and a $308,000 bonus for that year.  Petitioner's 1999 fiscal year FOCUS report reflects negative earnings before Federal income tax (EBFIT) of $15,768,385 and substantial declines in retained

_____

[12]  As discussed infra, some of petitioner's other employees received bonuses for petitioner's 1999 fiscal year--a bad year for petitioner.  We have no reason to question the arm's-length nature and reasonableness of the 1999 bonuses paid to those employees who (unlike Mrs. Wechsler) were unrelated to Mr. Wechsler.  We believe, however, that the method used to compensate Mr. Wechsler should differ materially from the method used to compensate petitioner's other employees, in light of the crucial importance of Mr. Wechsler's services to petitioner and petitioner's business.  We think an independent investor, to secure Mr. Wechsler's services in an arm's-length arrangement, on the one hand, would have to provide a method whereby Mr. Wechsler potentially could earn much higher annual pay from petitioner than petitioner's other employees.  Such a method for reasonably compensating Mr. Wechsler, on the other hand, would also closely tie his annual bonuses to petitioner's earnings and profitability in a given year.

earnings and capital stock. Notwithstanding petitioner's poor performance for its 1999 fiscal year, Mrs. Wechsler received a substantial 1999 bonus of $308,000. The record reflects that (except for Mr. Wechsler) petitioner's other employees received far lower bonuses for the 1999 fiscal year than Mrs. Wechsler received. For example, petitioner paid Matt Dickinson (its vice president and a principal, who had worked for petitioner since January 1989) a 1999 salary of $149,969 and a 1999 bonus of $115,768; petitioner paid Michael Revy (its vice president and a principal, who had worked for petitioner since August 1998) a 1999 salary of $208,000 and a 1999 bonus of $188,000; it paid Mr. Mittentag (its chief financial officer) a 1999 salary of $179,385 and a 1999 bonus of $43,461.

Mr. Wechsler set the amounts of petitioner's 1999 payments to Mrs. Wechsler. According to Mr. Wechsler, Mrs. Wechsler agreed to work for petitioner only if she were paid at least about $500,000 annually. That $500,000 minimum annual pay to her, however, is substantially higher than the 1999 annual salaries of the aforementioned officers who were unrelated to Mr. Wechsler and is also significantly higher than Mr. Wechsler's 1992 through 1998 annual salaries.[13] We are unpersuaded that

---

[13] On brief, petitioner argues that Mrs. Wechsler's compensation and Gilbert's compensation were reasonable when compared to the compensation paid certain other employees of petitioner, such as Mr. Lobel, who was paid $434,000 for fiscal year 1998. Petitioner notes that respondent did not challenge
(continued...)

there was internal consistency in salary payments throughout petitioner's ranks. This factor also strongly favors respondent.

F. Mr. Wechsler's Loans to Petitioner

In some circumstances, a key employee-shareholder's interest-free loans to the corporation may weigh in favor of higher compensation to that employee. See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325 n.33 (noting that key employee-shareholders' personal guaranties of loans to the corporation also weighed in favor of munificent compensation, but stating that the record was unclear as to the riskiness of the loans); R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 51 (1972) (similar).

Mr. Wechsler made short-term cash loans to petitioner during September and October 1998. During those months, beginning on September 1, Mr. Wechsler made loans to petitioner totaling $2,562,400 which petitioner repaid between September 24 and

---

[13](...continued)
petitioner's deduction of the compensation paid to those employees. Petitioner, however, has made no meaningful attempt to compare the qualifications of and services rendered by those employees to the qualifications of and services rendered by Mrs. Wechsler and Gilbert. As a result, we have no way of knowing how similar the services performed by those other employees were to the services performed by Mrs. Wechsler and Gilbert. Moreover, those other employees (unlike Mrs. Wechsler and Gilbert) were unrelated to Mr. Wechsler. Presumably, Mr. Wechsler determined and set the compensation that petitioner paid to those other employees (who were not close family members of Mr. Wechsler) in an arm's-length manner. The same cannot be said of the compensation Mr. Wechsler had petitioner pay to his wife and to his brother.

October 21. On October 8, 1998, Mr. Wechsler lent petitioner securities with a market value of $1,479,453. Six days later, on October 14, 1998, petitioner returned those securities to Mr. Wechsler. Petitioner fails to suggest an appropriate interest rate by which to measure any implicit interest payment to Mr. Wechsler on account of those loans. For simplicity, we shall assume an annual interest rate of 10.4 percent (0.0285 percent a day, based on a 365-day year),[14] no compounding, the total of the cash loans, $2,562,400, to be outstanding for 51 days, and the securities loan, value of $1,479,453, to be outstanding for 7 days. Interest forgone on the cash loans and the security loan would be $37,245 and $2,952, respectively, for a total of $40,197. We shall take that amount into account in determining reasonable compensation to Mr. Wechsler for fiscal year 1999.

V. Reasonable Compensation Determinations

   A. Reasonable Compensation to Mrs. Wechsler

In the light of the preceding discussion, we conclude that the $486,154 in total compensation petitioner paid Mrs. Wechsler for its 1999 fiscal year is not reasonable compensation and that petitioner overcompensated her for that year. We think, however, that reasonable compensation to her for that year exceeds the $150,000 respondent allowed in the notice of deficiency. Bearing

---

[14] The interest rate of 10.4 percent is the annual rate of return that Mr. Matthews determined would be satisfactory to an independent equity investor.

heavily against petitioner since the inexactitude in this case is of its own making, and using our best judgment, we conclude that reasonable compensation to Mrs. Wechsler for petitioner's 1999 fiscal year is $253,154. This $253,154 in reasonable compensation includes the $178,154 in annual salary that petitioner paid her and a $75,000 bonus to her for that year. See Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). We hold that petitioner can deduct this $253,154 in reasonable compensation under section 162(a)(1) for that year. We further hold that petitioner cannot deduct the remaining $233,000 in compensation (above the $253,154 we have determined to be reasonable) that it paid Mrs. Wechsler for that year. See secs. 1.162-7(a), 1.162-9, Income Tax Regs.

B. Reasonable Compensation to Gilbert

Petitioner has failed to establish that any portion of the amounts in issue paid by petitioner to Gilbert for its 1992 and 1993 fiscal years is reasonable compensation. Petitioner has not persuaded us that Gilbert performed any services of value for petitioner during the years in issue. Consequently, we sustain respondent's determinations that the $80,359 and $108,097 paid by petitioner to Gilbert for its 1992 and 1993 fiscal years, respectively, are not deductible by petitioner under section 162(a)(1).

C. Reasonable Compensation to Mr. Wechsler

1. Introduction

We believe that an appropriate method for reasonably compensating Mr. Wechsler for each of the years in issue should be based upon his receiving (1) an annual salary and (2) an annual bonus that is closely tied to petitioner's earnings and profitability for that year. We reach that conclusion because we are persuaded by respondent's expert (Mr. Hakala) of the appropriateness of that method. We are not persuaded by the approach of either of petitioner's experts. Our reasons follow.

2. Expert Testimony

a. Petitioner's Experts

i. Mr. Matthews

We give little if any weight to Mr. Matthews's opinion concerning the reasonableness of the compensation petitioner paid Mr. Wechsler for the years in issue to the extent it is based on his comparisons between petitioner and the 27 broker-dealers he examined. We are persuaded by Mr. Dorf that Mr. Matthews's approach in drawing an analogy between petitioner and the 27 broker-dealers is unreliable because of the disparity in size between petitioner and those companies. See B & D Founds., Inc. v. Commissioner, T.C. Memo. 2001-262 n.25 (rejecting expert's assumption that same mathematical relationship, calculated through regression analysis, between various surveyed companies'

sales or net income and those companies' compensation to their executives, should hold equally true for taxpayer-corporation; surveyed companies were many times the size of taxpayer and were not reasonably comparable to taxpayer).

Nor has Mr. Matthews convinced us that an independent investor would be satisfied with the 10.4-percent compounded annual rate of return on petitioner's common stock that Mr. Matthews computed for petitioner's 1992 through 1998 fiscal years. Mr. Matthews's written testimony is contained in two reports, an initial report and a report made in rebuttal to the testimony of respondent's expert, Mr. Hakala (the rebuttal report). The initial report contains no support for Mr. Matthews's conclusion beyond his claim that the 10.4-percent rate of return "would be highly satisfactory to most equity investors." In the rebuttal report, Mr. Matthews compares petitioner's return on equity with 17 publicly traded broker-dealers and finds the returns provided by petitioner to be satisfactory to a hypothetical investor. He also uses a financial tool, the capital asset pricing model, to determine the return an investor would expect for an investment in petitioner's common stock. He determines that the expected return on petitioner's common stock is satisfactory by comparing that return to the cost of equity determined under the capital asset pricing model using data with respect to "beta" (a measure of the

risk that compares the volatility of a specific stock to the market as whole) representing the median beta for six "smaller" publicly traded broker-dealers.

Mr. Matthews has failed to persuade us of the reliability of his return-on-equity comparison between the 17 broker-dealers and petitioner because he has failed to convince us that the 17 broker-dealers are comparable to petitioner, whose business interests were varied, as described in our findings of fact, and include an increasing concentration on its own proprietary trading and short-term and long-term investments. He has likewise failed to persuade us that his capital asset pricing model analysis is reliable because he has failed to persuade us of the comparability to petitioner of the six publicly traded "smaller" companies that he used to determine beta.

We also question whether a 10.4-percent compounded annual rate of return would be "highly satisfactory" to an independent investor in petitioner when compared to the compensation paid to petitioner over the 1992 through 1998 period. Mr. Matthews's calculations show that petitioner's adjusted common stock equity increased by $14.546 million, from $14.533 million to $29.079 million during that period. For that same period, petitioner compensated Mr. Wechsler $37.992 million. That $37.992 million is more than 2.5 times the $14.546 million increase in petitioner's adjusted common stock equity. Thus, for each dollar

of increase in equity over 1992 through 1998, petitioner paid Mr. Wechsler $2.50. While that may be an appropriate fee for wringing profits out of some dubious investment, it seems unreasonable for producing a compound rate of return of only 10.4 percent over 7 years when, according to Mr. Matthews's rebuttal report, the average risk-free rate of return during each May of 1992 through 1998 was approximately 7 percent. Moreover, the $37.992 million paid to Mr. Wechsler is substantially more than even petitioner's own adjusted common stock equity of $29.079 million and total adjusted (common and preferred) stock equity of $30.147 million at the end of petitioner's 1998 fiscal year. Mr. Matthews has failed to convince us that, for the 10.4-percent compound rate of return Mr. Wechsler produced for petitioner's 1992 through 1998 fiscal years, an independent investor would approve of paying him $36.497 million in total compensation.

ii. Mr. Dorf

Mr. Dorf, while recognizing that Mr. Wechsler's compensation in 1994 and 1998 was "higher than expected" (and, presumably, therefore, more than reasonable), was of the opinion that the average ($4,752,721) of the amounts of compensation paid Mr. Wechsler for the 8 years in question was "justified and reasonable".[15] Mr. Dorf based his conclusions on a number of

---

[15] During the 8 years in question, the range of Mr. Wechsler's annual compensation was $6,097,000, from a low of $1,390,000 (for 1997) to a high of $7,487,000 (for 1998). Mr.
(continued...)

considerations, including petitioner's performance, Mr. Wechsler's responsibilities to, and the services he provided for, petitioner, as well as general economic conditions and the nature of petitioner's business. However, Mr. Dorf did not give weight to these factors. Nor did he provide a method of analysis that an independent investor could use to determine whether Mr. Wechsler's compensation was reasonable or unreasonable in a given year. He merely concluded without explanation that, in the light of the factors he considered, Mr. Wechsler's average compensation was reasonable. Mr. Dorf's "trust-me" approach does not aid us substantially in determining whether an independent investor would be satisfied in any given year with the compensation paid Mr. Wechsler or whether that payment was reasonable, within the meaning of section 162(a)(1).

### iii. Conclusion

Neither of petitioner's experts' approaches provides a reliable method for determining whether the amounts of compensation paid to Mr. Wechsler during the years in issue were reasonable.

### b. Respondent's Expert

Mr. Hakala opined that the base salaries paid Mr. Wechsler throughout the relevant period were reasonable but that the

---

[15](...continued)
Dorf's average differs from the average ($4,748,971) we calculate from the annual compensation amounts stipulated by the parties.

bonuses paid were unreasonable. Mr. Hakala based his opinion on compensation practices in the investment industry. He opined that, in the investment industry, management is typically paid 20 percent of pretax profits as incentive compensation. Mr. Hakala opined that 20 percent of petitioner's pretax profits would have been reasonable as incentive compensation for all of petitioner's employees. Mr. Hakala split the resulting pool of incentive compensation 60/40, with Mr. Wechsler receiving 40 percent as a reasonable bonus. Thus, in Mr. Hakala's view, a reasonable bonus for Mr. Wechsler during the years at issue would have been equal to 40 percent of 20 percent of petitioner's profits (8 percent of petitioner's profits). While we agree with Mr. Hakala's percentage-of-profits approach to determining incentive compensation, we think his allocation to Mr. Wechsler is unreasonably low.

That allocation aside, we agree with Mr. Hakala's percentage-of-profits approach for the following reasons. During the years at issue, petitioner engaged in a range of activities. The company acted as a broker earning commission income, as a market maker earning income through the spread between its bid and ask prices, as a selling agent for underwriters, and as a proprietary trader exploiting sophisticated investment strategies in the convertible bond market. As Mr. Hakala has shown, the concentration of petitioner's operations make it distinguishable

from the broker-dealers Mr. Matthews identified. Though petitioner's endeavors covered a range of activities during the relevant period, proprietary trading was responsible for most of its revenue, and commissions generated only a small percentage. (According to the report of petitioner's expert, Mr. Dorf, during the audit period petitioner reaped only 0.4 percent of its income from commissions, whereas most of its income came from its investments.)

Because petitioner carried on a unique mix of investment services and trading operations, it would be difficult, if not impossible, to neatly classify its business. Rather, at best, petitioner could be described only as a business offering a unique combination of financial services and investments. Thus, in determining reasonable incentive compensation for Mr. Wechsler, we are unable to look to the compensation practices of any single business or any single type of business for guidance. Rather, we must look more generally to compensation practices in the investment industry.

As a basis for determining reasonable incentive compensation for Mr. Wechsler, we therefore adopt Mr. Hakala's percentage-of-profits approach, which he argues is customary in the investment industry. According to Mr. Hakala's calculations, an independent investor in petitioner would have received a reasonable return on equity had petitioner's incentive compensation been limited to 20

percent of petitioner's profits. Mr. Hakala compared his calculated return for petitioner with the returns an independent investor would have received by investing in other investments consisting of similar securities.

While we adopt Mr. Hakala's percentage-of-profits approach, we believe that a 20-percent-of-profits bonus pool divided 40/60 between Mr. Wechsler and other bonus-paid employees would under-compensate Mr. Wechsler, rewarding him with only 8 percent of petitioner's annual pre-bonus profits. In comparison to the other financial industry companies that Mr. Hakala examined, petitioner is a small company that had a much smaller workforce and an extremely lean management team. Following its move to Mt. Kisco, New York, and the outsourcing of its back-office operations, petitioner in late 1992 had approximately 20 employees. By 1999, the number of petitioner's employees decreased to 12. Consideration of petitioner's relatively small size and workforce, we believe, demonstrates Mr. Wechsler's indispensable role in the success of petitioner's business. We have no basis for concluding that the chief executives of the companies Mr. Hakala surveyed provided similar services and shouldered responsibilities comparable to the services Mr. Wechsler provided and the responsibilities he shouldered. Mr. Wechsler organized petitioner, served as its principal manager, worked long hours, ensured its compliance with all relevant

regulations, and closely supervised all of its investment and trading activities.  In essence, Mr. Wechsler single-handedly managed the business during the years at issue, and an independent investor holding equity in petitioner would have been investing predominantly, if not exclusively, in the trading and business judgment of Mr. Wechsler.

### 3.  Reasonable Compensation

We believe that the foregoing analysis justifies more compensation to Mr. Wechsler than that determined by Mr. Hakala, and an appropriate method for reasonably compensating Mr. Wechsler for each of the years in issue should be based upon his receiving (1) an annual salary and (2) an annual bonus that (A) reflects his virtually exclusive responsibility for petitioner's achievements and (B) is closely tied to petitioner's earnings and profitability for each year.

In evaluating petitioner's annual financial performance during the years in issue, all three experts (Messrs. Dorf, Hakala, and Matthews) used the earnings reported in petitioner's annual FOCUS reports, recognizing that those earnings were computed by marking to market all securities petitioner then held, including those held for investment.  Messrs. Dorf, Hakala, and Matthews each considered petitioner's annual FOCUS report earnings to be a more accurate indicator of petitioner's financial performance in a given year than the earnings reported

on petitioner's tax returns, and we accept that aspect of their opinions.

We conclude that reasonable compensation to Mr. Wechsler for the years in issue would include petitioner's payment to him of (1) the annual salaries he received, (2) for 1999, a payment of $40,917 to reflect interest, and (3) a yearly bonus equal to 20 percent of petitioner's adjusted EBFIT before petitioner's payment of any bonus to Mr. Wechsler for that year.[16]

Using the above method for determining Mr. Wechsler's compensation, we calculate that reasonable compensation to Mr. Wechsler for petitioner's 1992 through 1999 fiscal years in issue is as follows:

| FYE May 31 | Salary | Annual Adj. EBFIT[1] | Adj. EBFIT Before Bonus[2] | Annual Bonus[3] and Interest | Total Comp. |
|---|---|---|---|---|---|
| 1992 | $390,000 | $4,002,465 | $8,002,465 | $1,600,493 | $1,990,493 |
| 1993 | 390,000 | 6,281,781 | 10,781,781 | 2,156,356 | 2,546,356 |
| 1994 | 390,000 | (1,910,871) | 4,789,129 | 957,826 | 1,347,826 |
| 1995 | 405,000 | 6,404,771 | 11,859,771 | 2,371,954 | 2,776,954 |
| 1996 | 390,000 | 12,927,869 | 17,927,869 | 3,585,574 | 3,975,574 |
| 1997 | 390,000 | (4,295,611) | (3,295,611) | -0- | 390,000 |
| 1998 | 415,000 | 2,911,631 | 9,983,631 | 1,996,726 | 2,411,726 |
| 1999 | 571,694 | (15,535,385) | (14,612,309) | 40,197 | 611,891 |

[1] EBFIT for that year, plus (if any) disallowed, nondeductible compensation for that year paid by petitioner to Mrs. Wechsler or Gilbert.

[2] Adjusted EBFIT for that year, plus December and May bonuses for that year actually paid by petitioner to Mr. Wechsler.

[3] Equal to 20 percent of adjusted EBFIT before bonus for that year (rounded to nearest dollar) plus, for 1999, $40,197, as a payment of interest.

---

[16] Petitioner's adjusted EBFIT is the EBFIT reported on its FOCUS report for that year, increased by any disallowed, nondeductible compensation petitioner paid for that year to Mrs. Wechsler or Gilbert.

For petitioner's 1992 through 1999 fiscal years in issue, this results in reasonable compensation to Mr. Wechsler totaling $16,050,820.

We estimate that this results in petitioner's having a compounded annual return on its revised common stock equity, adjusted for deferred taxes, of approximately 16.3 percent for its 1992 through 1998 fiscal years. That calculation is as follows:

| FYE May 31 | Adj. Common Stock Equity (millions)[1] | Revised Adj. Common Stock Equity (millions)[2] | Annual Rate of Return[3] | Compounded Annual Rate of Return[4] |
|---|---|---|---|---|
| 1991 | $14.533 | $14.533 | -- | -- |
| 1992 | 16.924 | 18.412 | 26.7% | 26.7% |
| 1993 | 19.828 | 22.768 | 23.7 | 25.2 |
| 1994 | 18.100 | 24.485 | 7.5 | 19.0 |
| 1995 | 22.893 | 31.128 | 27.1 | 21.0 |
| 1996 | 30.177 | 39.261 | 26.1 | 22.0 |
| 1997 | 27.591 | 37.205 | (5.2) | 17.0 |
| 1998 | 29.079 | 41.738 | 12.2 | 16.3 |
| 1999 | 19.539 | 32.868 | (21.2) | 10.7 |

[1] Common stock equity per annual FOCUS report, less deferred taxes.

[2] Adjusted common stock equity, plus cumulative estimated additional after-tax earnings attributable to petitioner's increased positive taxable income for prior years and current year from disallowed, nondeductible compensation paid to Mr. Wechsler, Mrs. Wechsler, and Gilbert, assuming those increases in positive taxable income were subject to combined Federal and State income taxes equal to 40 percent.

[3] Increase or decrease for that year in revised adjusted common stock equity, divided by revised adjusted common stock equity at beginning of that year.

[4] Computed using a present-value-future-value formula where: Present value equals revised adjusted common stock equity of

$14.533 million on June 1, 1991; future value equals revised adjusted common stock equity at the end of the period in question; and n equals the number of years from June 1, 1991, through the end of that period.

We think an independent investor would be satisfied with a 16.3-percent compounded annual return on petitioner's revised adjusted common stock equity from June 1, 1991, through May 31, 1998.

We find that $16,050,820 is reasonable compensation to Mr. Wechsler for the 1992 through 1999 fiscal years in issue, and is, therefore, deductible by petitioner under section 162(a)(1) for those years in the amounts shown. For some of the years in issue, however, we have found that reasonable compensation paid to Mr. Wechsler is less than allowed by respondent. On March 23, 2005, shortly after the trial began, respondent moved for leave to amend his answer in order to assert increased deficiencies for the years in issue above those determined in the notice of deficiency, in the light of the expected testimony of respondent's expert, Mr. Hakala. The time for respondent to amend his answer without leave had expired on September 1, 2004. See Rule 41(a). On March 23, 2005, we denied respondent's motion because of the lateness of its filing on the day of trial and refused to allow respondent to seek such increased deficiencies. We shall, therefore, not redetermine a deficiency for any year in issue greater than respondent determined in the notice for that year.

VI.  Conclusion

To reflect the foregoing,

Decision will be entered

under Rule 155.